IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL No. 1:16-mj 216 |
| | ) | |
| MOHAMED BAILOR JALLOH, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF A CRIMNAL COMPLAINT

Your affiant, Special Agent Nicholas Caslen of the Federal Bureau of Investigation (hereafter FBI), being duly sworn, states as follows:

### INTRODUCTION

1.     I make this affidavit in support of a criminal complaint charging MOHAMED BAILOR JALLOH (hereinafter JALLOH), with attempting to provide material support to a designated foreign terrorist organization, to wit:  the Islamic State of Iraq and the Levant (ISIL), in violation of Title 18, United States Code, Section 2339B.   I also submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence of JALLOH, known as ▮▮▮▮▮▮▮▮▮ Sterling, Virginia, hereinafter "PREMISES," further described in Attachment A, for things described in Attachment B.

2.     Investigation to date has established probable cause to believe that JALLOH has attempted and is attempting to provide material support and resources to ISIL, including the service of assisting in the procurement of weapons to be used in an attack on U.S. soil in the name of ISIL and money to assist in the facilitation of individuals seeking to join ISIL, knowing

1

that the organization is a designated terrorist organization, that the organization has engaged or engages in terrorist activity, and that the organization has engaged or engages in terrorism in violation of Title 18, United States Code, Section 2339B.

3.      I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since 2011. I am currently assigned to the FBI Washington Field Office (WFO), Joint Terrorism Task Force (JTTF). As part of my duties with the WFO JTTF, I am assigned to investigate counter terrorism matters in Washington, D.C., northern Virginia, and elsewhere. Prior to being assigned in Washington, DC, I was assigned to the JTTF in Wichita, KS. In preparation for this assignment, and as part of my continuing education, I have successfully completed national security focused training, to include formal courses and training exercises. I have also read and/or studied numerous publications related to historical and current terrorism topics authored by analysts, investigators, and in some cases, actual members or supporters of designated Foreign Terrorist Organizations (FTO). I have participated in all aspects of counter terrorism investigations, including but not limited to conducting physical surveillance, telephone, email, and financial analysis obtained as a result of subpoenas, subject interviews, witness interviews, electronic surveillance, and operations of confidential human sources and undercover employees. Among other duties, I am currently involved in the investigation of MOHAMED JALLOH, hereinafter "JALLOH," who resides at the PREMISES, located within the Eastern District of Virginia. I am an investigative or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

4.      This affidavit is being submitted for the limited purpose of obtaining a criminal complaint and search warrant and does not include each and every fact observed by me or known to the government. I have set forth only those facts necessary to support a finding of probable cause.

## THE ISLAMIC STATE OF IRAQ AND THE LEVANT

5.      On October 15, 2004, the United States Secretary of State designated Al-Qaeda in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and Specifically Designated Global Terrorist under section 1(b) of Executive Order 13224.

6.      On May 15, 2015, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and Specifically Designated Global Terrorist under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al'Sham (ISIS), the Islamic State of Iraq and Syria (ISIS), ad-Dawla al'Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State, ISIL, and ISIS. Although the group has never called itself "Al-Qaeda in Iraq (AQI)," this name has frequently been used to describe it through its history. To date, ISIL remains a designated FTO. In an audio recording publically released on June 29, 2014, ISIL announced a formal change of ISIL's name to Islamic State (IS). On or about September 21, 2014, ISIL spokesman Abu Muhammad al-Adnani called for attacks against citizens – military or civilian – of the countries participating in the United States-led Coalition against ISIL.

3

**THE DEFENDANT**

7.     JALLOH was born in September 1989 in Sierra Leone and is a naturalized United

States citizen.

**RELEVANT LAW**

8.     I am advised that, Title 18, U.S.C. Section 2339B – Providing material support or

resources to designated foreign terrorist organizations, provides in pertinent part:

>     (a)     Offense. – Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so shall be fined under this title, imprisoned not more than 20 years, or both, and if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization, that the organization has engaged or engages in terrorist activity, or that the organization has engaged or engages in terrorism.

> I am also advised that, Title 18 U.S.C. Section 2339A(b)(1) provides, in pertinent part:

> The term "material support" or resources means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

**BACKGROUND OF THE INVESTIGATION AND
STATEMENT OF PROBABLE CAUSE**

9.     In or around late March, 2016, Unindicted Co-Conspirator 1 (UCC1), a now

deceased member of the designated Foreign Terrorist Organization (FTO), ISIL, brokered an

online introduction between confidential Human Source 1 (CHS1) and an individual later

identified by the FBI as JALLOH. The initial contact between CHS1 and JALLOH took place on

or about March 27, 2016. Prior to his/her death, UCC1, who lived overseas, was actively plotting

an attack in the United States which UCC1 believed would be carried out with the assistance of

both CHS1 and JALLOH. Based on conversations between CHS1 and UCC1, and CHS1 and

JALLOH, UCC1 had communicated with JALLOH before JALLOH was ever contacted by CHS1. The conversations between JALLOH and CHS1 will be discussed in more detail below.

10. On or about April 2, 2016, UCC1 contacted CHS1 and asked about CHS1's willingness to take part in an attack operation in the United States. Specifically, UCC1 asked CHS1 if "later on when day for operation comes," did CHS1 have any family members willing to participate in an attack. UCC1 told CHS1, "its not a light decision but a rewarding one."

11. After UCC1 told CHS1 to contact JALLOH, CHS1 and JALLOH began communicating in order to coordinate an in-person meeting to take place on or about April 9, 2016. During these discussions, JALLOH told to CHS1 that he (JALLOH) resided in Sterling, Virginia. An in-person meeting between CHS1 and JALLOH was encouraged by and coordinated at the direction of UCC1.

12. On or about April 9, 2016, CHS1 and JALLOH met in person in Sterling, Virginia[1]. FBI physical surveillance of the meeting revealed an individual matching the description of JALLOH operating a vehicle registered to a family member of JALLOH's. Upon comparing United States Passport photographs of individuals associated with the registered address for this vehicle, JALLOH was confirmed as the individual that met CHS1 by both FBI physical surveillance and CHS1.

13. During the April 9th meeting with CHS1, JALLOH disclosed to CHS1 that he (JALLOH) is originally from Sierra Leone and has been a Muslim his entire life. JALLOH has listened to a lot of lectures including those by "Shaykh Anwar," known to your affiant to be a reference to now deceased Al-Qaeda in the Arabian Peninsula leader Anwar al-Aulaqi (Aulaqi).

---

[1] Unless otherwise noted, all in-person meetings with JALLOH were consensually recorded.

During a recent six month trip to Africa, JALLOH met "khilafa"[2] brothers in Nigeria. JALLOH described these individuals as "really good brothers." It was during this trip that JALLOH first made contact with UCC1 online. JALLOH told UCC1 that he was interested in making hijrah[3] to Libya, which your affiant assesses to mean JALLOH intended to join ISIL in Libya. JALLOH indicated he had even saved money to perform hijrah to Libya, and that he maintains a social media[4] presence to feel connected with "Dawlah."[5]

14.     JALLOH told CHS1 that Mohamed Yousef Abdulaziz, a now-deceased gunman who killed five United States military members in a terrorist attack in Chattanooga, Tennessee, in July 2015, was a "very good man."

15.     JALLOH is a former member of the United States Army National Guard, but he decided to quit after listening to Aulaqi lectures online. JALLOH was first introduced to Aulaqi's lectures after hearing the news media refer to Aulaqi as a "hate preacher." This prompted JALLOH to research Aulaqi online where he (JALLOH) discovered Aulaqi's lectures. JALLOH explained that Aulaqi said it was a duty of every able Muslim to resist the American presence and activity in Iraq and Afghanistan. JALLOH told CHS1 that once the "Khilafah" was announced, "I understood this was the reality." JALLOH said that listening to Aulaqi lectures helped him to "understand."

---

[2] "Khilafa" is an Arabic term for the Islamic caliphate. In this context, your affiant assesses JALLOH was referencing ISIL members.

[3] "Hijrah" is an Arabic term that means migration or journey. In the Islamic faith, hijrah generally means migration to a Muslim land. In this context, your affiant assesses JALLOH is using the term "hijrah" to refer to his journey to join ISIL. Based on my training and experience, ISIL supporters refer to the travel to join ISIL as "hijrah."

[4] JALLOH maintains a social media account that is openly supportive of Islamic extremism and associates with other users who openly support ISIL. Your affiant assesses that JALLOH maintains this social media account as a means of staying connected to other ISIL supporters. ISIL's use of mainstream social media platforms and videos are a key component of their recruitment efforts online, especially in western nations.

[5] "Dawlah" is an Arabic term that means state. Your affiant is aware that ISIL members and supporters refer to ISIL as "Dawlah" which is short for Dawla al Islamiya or Islamic State.

16.     Later in the conversation, JALLOH said that he thinks about conducting an attack all the time, and he was close to doing so at one point. JALLOH claimed to know how to shoot guns, and that he had been thinking about conducting a Nidal Hassan (Hassan) – style attack. When asked to explain what he meant, JALLOH said, "Nidal Hassan type of things. That's the kind of stuff I started thinking you know." Hassan is a former Major in the United States Army who killed 13 people and wounded 32 others in a terrorist attack on Fort Hood, Texas in November 2009.

17.     During the course of this investigation, your affiant learned that on or about February 13, 2016, JALLOH purchased a Glock 19 9mm handgun.

18.     A review of U.S. Customs and Border Protection travel records indicated JALLOH departed the United States on or about June 11, 2015 via John F. Kennedy International Airport with a final destination of Sierra Leone. On or about January 16, 2016, JALLOH returned to the United States from Sierra Leone via John F. Kennedy International Airport. Based on the length of time JALLOH was overseas for this trip and the comments made by JALLOH to CHS1 on or about April 9, 2016, I believe it was during this overseas trip that JALLOH met ISIL members in Nigeria and first established contact with UCC1.

19.     On or about April 14, 2016, CHS1 told UCC1 about the meeting with JALLOH. While they were discussing possible attack operations, UCC1 directed CHS1 to include JALLOH in any attack planning if JALLOH was interested.

20.     On or about April 21, 2016, JALLOH confirmed to CHS1 that he (JALLOH) had discussed attack plans with UCC1. JALLOH told CHS1 that UCC1 had asked JALLOH if JALLOH wanted to participate in an attack. JALLOH informed CHS1 that he told UCC1, "I really want to but I don't want to give my word and not fulfill it."

21.     On or about April 24, 2016, JALLOH told CHS1, "I just want to live a good Muslim life and die as a Shaheed."[6]

22.     During an in-person meeting between CHS1 and JALLOH on or about May 1, 2016, JALLOH inquired about the timeline for an operation to be directed by UCC1 and involving CHS1 and possibly JALLOH. JALLOH expressed that it was better to plan an operation for Ramadan. JALLOH indicated he is working on himself to ensure his heart is strong and does not fail him at the moment when it is needed the most.

23.     Also at the May 1st meeting, JALLOH asked CHS1 if CHS1 could assist JALLOH if JALLOH wanted to make a donation (to ISIL). When asked to clarify, JALLOH replied, "like if you want to like support the Khilafah through you know, like wealth." JALLOH explained that by wealth he meant money.

24.     JALLOH referenced past conversations he had with UCC1 in which UCC1 asked if JALLOH would commit to participating in an operation. JALLOH stated he did not give UCC1 an answer then because he did not want to just please UCC1. When discussing potential attack operations with CHS1, JALLOH reiterated that it was something he had thought about and as a result, had even purchased a handgun. Your affiant believes JALLOH was referencing the Glock 19 9mm handgun purchase from February, 2016 when he made this statement. JALLOH admitted to going to a shooting range at times. JALLOH also said that conducting an operation was not supposed to be easy because it is a test. Attaining "Jannah"[7] is not easy, according to JALLOH. When discussing the support JALLOH could provide if he decided not to take part in an operation himself, JALLOH offered the possibilities of providing money and/or weapons.

---

[6] "Shaheed" is an Arabic term for a Muslim martyr. In this context, the FBI assesses JALLOH wishes to die a martyr during the conduct of jihad.

[7] "Jannah" is the Islamic concept of paradise. Many Islamic extremists believe the reward for dying as a martyr or shaheed is entrance into Jannah.

JALLOH explained he had a family member, hereinafter referred to as Unindicted Co-Conspirator 2 (UCC2), with access to weapons, specifically AR-15s and AK-47s.

25.     .Also during the May 1st meeting, JALLOH told CHS1 that he prays to Allah for forgiveness and then he asks Allah to make his ending be death as a shaheed. JALLOH also said he prays for prisoners and the mujahedeen.[8]

26.     When discussing attack operations, JALLOH stated he knows such operations are "100 percent the right thing." JALLOH then asked if CHS1 ever thought about targeted operations (targeted killings). JALLOH then identified a person by name who had organized multiple Draw the Prophet Mohammad contests in the United States.[9] JALLOH provided the general location for this individual and described this individual as "evil." JALLOH insinuated that this individual would be an ideal focus of a targeted attack because of his/her actions against the Prophet Mohammad.

27.     JALLOH explained, "sometimes you just have to take action...you can't be thinking too much...you have to pick a action and take it cuz time is not on your side...since Khilafah was announced, what, June, 2014[10]? It's nearly two years now...time flies. Before you

---

[8] "Mujahedeen" is an Arabic term for Islamic fighters engaged in jihad.

[9] In May 2015, Elton Simpson and Nadir Soofi attacked the "First Annual Muhammad Art Exhibit and Contest" held at the Curtis Culwell Center in Garland, Texas. This event was organized by the individual identified by JALLOH. Both Simpson and Soofi were killed by law enforcement officers in the attack. Shortly before the attack, Simpson pledged his allegiance to ISIL on social media. Days later, ISIL claimed responsibility for the attack in a radio broadcast.

[10] Following ISIL's capture of Mosul, Iraq in June 2014, on or about June 29, 2014, ISIL formally changed its name to the Islamic State and declared the establishment of an Islamic Caliphate to include portions of Iraq and Syria. Additionally, Abu Bakr al-Baghdadi was named as the Caliph and leader of the so called Islamic State.

know it, it's three, four, five years, and you're still stuck in dunya[11] or in dar ul kufar[12]...find

yourself not, on the sidelines still, which is the problem."

28. On or about May 11, 2016, JALLOH asked CHS1, "if I want to send some

sadaqa[13] for the Mujahideen with Ramadan coming up do you have any links for that

InshaAllah."[14] Upon being told of an individual with ISIL who could receive funds from

JALLOH, JALLOH indicated he was interested in sending $500. JALLOH later thanked CHS1

for offering to assist JALLOH in supporting the Khilafah (ISIL) financially. Based on the

comments JALLOH made to CHS1, your affiant believes JALLOH understood that the funds

would be used to help facilitate fighters traveling to join ISIL.

29. On or about May 13, 2016, CHS1 provided JALLOH with a Mobile Messaging

account (hereinafter referred to as MM1) that JALLOH was told could be used to provide funds

to members of ISIL. In actuality, MM1 was controlled by FBI Employee 1, acting in an

undercover capacity. FBI Employee 1 portrayed him/herself as a member of ISIL located

overseas.

30. On or about May 17, 2016, JALLOH told CHS1 that he had initiated a

conversation with FBI Employee 1 via MM1. JALLOH requested that CHS1 inform the person

he believed to be a member of ISIL (FBI Employee 1), of JALLOH's account moniker so FBI

Employee 1 would know JALLOH was the person who had initiated the conversation.

Additionally, JALLOH asked CHS1 what kinds of weapons, specifically "pistols or AK's,"

---

[11] "Dunya" is an Arabic term most commonly defined as the temporal world – and its earthly concerns and possessions. In the Islamic faith, many Muslims refer to their present lives on Earth as the dunya.

[12] "Dar ul kufar" is an Islamic concept meaning a land governed by the "kufar" (disbelievers) and whose security is not maintained by Muslims.

[13] "Sadaqa" is an Arabic term meaning voluntary charity. In this context, your affiant believes that JALLOH was referring to providing financial support to ISIL.

[14] "InshaAllah" is an Arabic term meaning "God willing."

CHS1 wanted JALLOH's assistance in procuring. The day prior to May 17, 2016, CHS1 had told JALLOH that these weapons would be used in a targeted attack, similar to the one previously suggested by JALLOH, on two United States military personnel in the United States, and it would be followed by an unspecified attack directed by ISIL. JALLOH concluded the conversation by saying, "I will support with whatever you need from me, I need the reward from Allah and my sins to be forgiven."

31.     On or about May 17, 2016, FBI Employee 1 confirmed that JALLOH had initiated a conversation with FBI Employee 1 via MM1. To initiate this conversation, JALLOH utilized a Mobile Messaging account known by your affiant to be operated by JALLOH.

32.     On or about May 19, 2016, in response to CHS1's request for JALLOH's assistance in procuring weapons and concern that UCC2 would alert law enforcement of CHS1 and JALLOH's interest in procuring weapons, JALLOH reassured CHS1, stating, "...Akhi I'm sure he won't be suspicious and even if he his (sic) he wouldn't report anything he has some charges himself and he wants to stay clear of the authorities."

33.     On or about May 20, 2016, JALLOH indicated to CHS1 he (JALLOH) intended to contact UCC2 the coming weekend to ascertain if UCC2 had identified weapons available for purchase.

34.     On or about May 20, 2016, JALLOH asked FBI Employee 1 if he (JALLOH) could "start sending the sadaqa in Ramadan inshaAllah or are you in need of it now." JALLOH later indicated he would do his best to send the money soon.

35.     On or about May 22, 2016, JALLOH indicated UCC2 was attempting to gain access to weapons for purchase, stating, "...yes I talked to him he's working on it for me Akhi I'll let you know InshaAllah."

36.     On or about June 16, 2016, JALLOH indicated to CHS he (JALLOH) was traveling to North Carolina and planned to meet with UCC2. CHS responded, saying, "Insha'Allah akhi if he can help i can meet you in North Carolina." JALLOH replied, "Naam Akhi that's why I'm meeting him face to face."

37.     On or about June 18, 2016, FBI surveillance observed JALLOH and UCC2 together for approximately four (4) hours in the vicinity of Charlotte, North Carolina. During this time period, JALLOH and UCC2 traveled to various destinations in the Charlotte area.

38.     On or about June 18, 2016, JALLOH contacted CHS1 and stated, "Alaikum Salam Akhi, I've been here with [UCC2] we got nothing drove around with him saw an AK but the person didn't want to sell it..."

39.     On or about June 19, 2016, JALLOH told CHS1, "...Akhi please have sabr[15] I'm doing my best, [UCC2] is trying his best also the weapons I saw there people didn't want to sell it just be patient Akh you're going to get something nice inshaAllah."

40.     On or about June 20, 2016, JALLOH contacted FBI Employee 1 via MM1 and provided the information required to provide funds to ISIL via FBI Employee 1. In addition to the information required, which included an access code for a prepaid cash transfer, JALLOH stated, "Ameen Akhi make dua for me that I get shahada Akhi please...it should be $500 dollars in there inshaAllah." On or about June 21, 2016, your affiant accessed the prepaid cash transfer system and confirmed $500 was attached to the access code provided by JALLOH. On June 22, 2016, FBI Special Agents withdrew the $500 provided by JALLOH and placed the $500 in FBI evidence control.

41.     On or about June 25, 2016, JALLOH contacted CHS1 and stated, "...Akhi may Allah bestow his mercy on us and the khilafah...I have to find time again to head down to North

---

[15] "Sabr" is an Arabic term meaning "patience."

Carolina inshaAllah [UCC2] has secured one for me I want to get a second one also inshaAllah."
Your affiant assesses JALLOH is referring to UCC2 securing weapons. CHS1 thanked JALLOH
and indicated he (CHS) would like to receive the weapons soon. JALLOH replied, "…Akhi
you're just now letting me know you're planning for this year's Ramadan before you had told me
it's a years plan and also what [UCC1] had told me…"

42.     On or about July 1, 2016, at approximately 8:38 p.m., FBI physical surveillance
observed JALLOH entering a firearms dealership/firing range (FFL) in Chantilly, Virginia.
JALLOH was inside FFL for approximately 10 minutes. JALLOH was operating his known
Toyota Camry during this trip to FFL.

43.     On or about July 2, 2016, FBI Agents were provided a copy of the security
camera video from FFL for the time period during which JALLOH was inside FFL on July 1,
2016. The video portrayed JALLOH speaking with employees and handling an assault rifle. FBI
Agents interviewed one of the employees, who stated JALLOH attempted to purchase a
Bushmaster AR-15, but that JALLOH did not have the requisite forms of identification with him
to purchase the weapon. JALLOH told the employee he (JALLOH) would return on July 2,
2016, to purchase the assault rifle.

44.     On or about July 2, 2016, at approximately 8:15 p.m., JALLOH returned to FFL
and purchased a Stag Arms SA1 5.56 caliber rifle, serial number Y406052. FBI physical
surveillance observed JALLOH entering and exiting FFL and an FBI Special Agent observed
JALLOH purchasing the assault rifle and test firing the assault rifle at FFL's firing range.
JALLOH provided his Virginia Driver's license and U.S Passport as forms of identification.
Prior to JALLOH departing FFL with the purchased assault rifle, the weapon was rendered
inoperable. JALLOH was operating his known Honda Accord on this trip to FFL.

13

**PREMISES**

45.     Investigation to date, including physical surveillance, has confirmed that the PREMISES is JALLOH's residence.   Additionally, DMV records list the PREMISES as JALLOH's residence during all times relevant to the investigation.  Investigation has established that the PREMISES is the only place to which JALLOH has access to store belongings. Investigation has also established JALLOH utilized his cellular telephone to communicate with UCC1.  Based on my training and experience, individuals planning a terrorist attack, planning to travel to commit violent jihad, or planning to provide other material support to a designated terrorist organization use electronic and other means to view propaganda materials, communicate with members of designated terrorist organizations, communicate with individuals directing terrorist attacks on behalf of a designated terrorist organization, and communicate with individuals who facilitate travel to join ISIL.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

46.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

47.     *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

48. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when,

where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and

have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

49.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large

volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

50. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

51.     Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

52.     I submit that this affidavit supports probable cause for a criminal complaint charging MOHAMED BAILOR JALLOH with attempting to provide material support to a designated foreign terrorist organization, to wit:  the Islamic State of Iraq and the Levant (ISIL), in violation of Title 18, United States Code, Section 2339B.  I also submit there is probable cause for a warrant to search the premises described in Attachment A and seize the items described in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Nicholas Caslen
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me this 3rd day of July 2016.


Theresa C. Buchanan
United States Magistrate Judge


21